Savannah A. SINGLETON

v.

The UNITED STATES.

No. 13–83L.

United States Claims Court.

Aug. 1, 1984.

---

E. Byron Singleton, Amarillo, Tex., for plaintiff.

Lawrence W. Puckett, Washington, D.C., with whom was Asst. Atty. Gen., F. Henry Habicht, II, Washington, D.C., for defendant.

## OPINION

LYDON, Judge:

This case comes before the court on defendant's motion for summary judgment, which is supported by five affidavits and other pertinent documentation. Plaintiff opposes said motion on the ground that genuine and material issues of fact exist which serve to preclude allowance of defendant's summary judgment motion. Plaintiff's opposition is not supported by any affidavits.

Plaintiff's complaint was filed in this court on January 14, 1983, amended on May 26, 1983, seeking just compensation for real and personal property damage suffered from a flood which occurred on or about October 31, 1981. Plaintiff also alleged that for a period of more than 2 years prior to October 31, 1981, her property was subject "to a multiple of trespasses and a multiple of infusions subsurface." Plaintiff premised her right to recover

damages on theories of inverse condemnation, tort and implied contract.[1]

For reasons set forth below, defendant's motion for summary judgment is granted.

### I.

The following facts are deemed established by the pleadings and defendant's affidavits and other documents which accompanied its motion for summary judgment.

The real property involved in this suit is located in a subdivision known as Shorecrest Acres, an addition to the town of Grapevine, Texas. The materials before the court do not show when this subdivision was developed. The real property in question is described on a map of Shorecrest Acres as "Lot 71" in Tarrant County, Texas. Lot 71 was adjacent to Grapevine Lake and was upstream from the Grapevine Dam. Plaintiff purchased Lot 71 on December 31, 1980. The materials before the court do not show the purchase price. Plaintiff sold Lot 71 on April 19, 1983, for $120,000.

Lot 71 was somewhat rectangular in shape. The side adjacent to Grapevine Lake was about 160 feet in length. The parcel comprised about 15,000 square feet. Two houses were located on Lot 71: a residential house and a rental house. The residential house was a split level structure with a garage located beneath the floor level of the house. The floor level of this house was at elevation 567.6 feet mean sea level (msl). The lowest elevation of the garage floor of this house was 560.91 feet msl.

Construction of Grapevine Dam, which was authorized by Congress under the River and Harbor Act of March 2, 1945, Pub.L. No. 79–14, 59 Stat. 18, was completed in June 1952, and deliberate impounding of water began on July 3, 1952. One of the specific purposes for the construction of this Dam, referred to as the Grapevine Dam Project, was flood control, as was manifested in section 2 of Pub.L. No. 79–14, *supra*. The construction of this Dam created a reservoir or lake designed for a maximum water surface of 19,420 acres. Attendant to the construction of Grapevine Dam, flowage easements and other necessary land acquisitions were acquired by the United States Army Corps of Engineers, Fort Worth District (Corps of Engineers), through condemnation proceedings or purchase between April 1948 and April 1962 for the Grapevine project. The Corps of Engineers was authorized to acquire land adjacent to the project in fee simple if said land lay below 560.0 feet msl and was authorized to acquire flowage easements on land which lay below 575.0 feet msl. The Corps of Engineers is responsible for the operation and maintenance of the Grapevine Dam Project.

Grapevine Dam is located at river mile 11.7 on Denton Creek in the Trinity River Basin near Grapevine, Texas. It is about 20 miles northwest of Dallas, Texas. Grapevine Lake is located in both Tarrant and Denton Counties, Texas.

The top of the flood control pool of Grapevine Lake and the uncontrolled spillway crest level of the Grapevine Dam is 560.0 feet msl. The top of the conservation pool level of Grapevine Lake is 535.0 feet msl. Accordingly, the flood pool of Grapevine Lake is from 535.0 feet msl to 560.0 feet msl.

Since Grapevine Dam was constructed and became operational in 1952, floodwaters have flowed over the spillway, *i.e.*, exceeded 560.0 feet msl, only twice: on June 6, 1957 (peak elevation 560.8 feet msl)

1. On January 14, 1983, as amended on May 6, 1983, plaintiff filed a complaint under the Federal Tort Claims Act (chattel damages) and the Tucker Act (inverse condemnation of real property) in the United States District Court for the Northern District of Texas, Forth Worth Division, as a result of the events which also underscore plaintiff's instant suit in this court. The District Court dismissed plaintiff's claim because it exceeded the court's jurisdictional limits imposed by 28 U.S.C. § 1346(a)(2). The District Court stated in its "Order of Dismissal" that "[j]urisdiction is proper in the United States Court of Claims as provided by Title 28, United States Code § 1491."

and on November 1, 1981 (peak elevation 563.50 feet msl).

The November 1, 1981, flood is the occurrence which triggered this lawsuit.[2] During October 1981, Grapevine Lake's watershed received substantial rainfall, a total of 11.94 inches. On November 1, 1981, this watershed received another 2.98 inches of rainfall. As a result of this rainfall, Grapevine Lake peaked, on November 1, 1981, at a flood level of 563.50 feet msl.

The November 1, 1981, flood slightly exceeded the magnitude of a 100-year flood. A 100-year flood is one of such volume and magnitude that it is expected to occur an average of only once every 100 years. Put another way, such a flood has only a one percent chance of occurring in any particular year. The estimated frequency for a flood reaching 560.0 feel msl, which is the spillway crest level of the Grapevine Dam, is once in 66 years, with a 1.5 percent chance of being equaled or exceeded in any particular year. The above uncontested facts, based on hydrographic data recorded and compiled by the Corps of Engineers, are contained in the affidavit of the Chief, Hydrology Section, Engineering Division, Corps of Engineers, Fort Worth District. In the opinion of the Chief of Hydrology Section, as stated in his affidavit, the lowest level of the residency on Lot 71, *i.e.*, 560.91 msl, would be subject to surface flooding from Grapevine Lake an average of once in 75 years. He based his opinion on a review of the Grapevine Lake Pool Elevation Frequency graph plotted from hydrographic data referred to above, which was attached as an exhibit to defendant's motion for summary judgment. Because of his position, expertise in hydrology, responsibilities and familiarity with Grapevine Lake and the Grapevine Project, the affidavit of the Chief of Hydrology Section is most persuasive evidence. Said evidence stands uncontroverted.

The November 1, 1981, flood did reach the garage level of the main residency house on Lot 71. The flood level peaked at elevation 563.50 feet msl whereas the lowest elevation of the garage floor of said residency was 560.90 feet msl. However, there is no allegation, nor any evidence, that the November 1, 1981, flood reached or affected either the rental house on Lot 71 or the first floor level of said residency which was at elevation 567.6 feet msl.

The groundwater or subsurface water level in and about the main residency house on Lot 71 during the years 1958 until late October or early November 1981 did not reach or affect the lowest elevation of said house. The highest groundwater level for the 3 years prior to the late October, early November 1981 flooding was approximately 537 feet msl. This elevation is more than 23 feet below the lowest elevation of 560.91 of the main residency house. The above uncontested facts, based on hydrographic data recorded and compiled by the Corps of Engineers, are contained in the affidavit of a registered professional staff geologist in the Geology Section of the Geotechnical Branch, Engineering Division, Corps of Engineers, Fort Worth District. In the opinion of the staff geologist, as stated in his affidavit, based upon the available hydrographic data, his groundwater hydrological experience, and professionally accepted geological principles of groundwater movement and levels, the groundwater beneath the main residency house has never been more than 1-foot higher than the level of Grapevine Lake; that from July 3, 1952, when the Dam was closed and water was impounded, until November 1, 1981, the level of Grapevine Lake exceeded elevation 560 feet msl on only two occasions, *i.e.*, June 6, 1957 (560.8 feet msl) and November 1, 1981 (563.50 feet msl); and that the groundwater level in the vicinity of the main residency house on Lot 71 will reach

---

**2.** Plaintiff refers to the flooding of October 31, 1981, as the "visible evidence of inverse condemnation" whereas defendant refers to November 1, 1981, as the date of the apex of said flooding. Both parties are obviously referring to the same incident. On October 31, 1981, the level of Grapevine Lake exceeded 560.0 feet msl, and reached its maximum elevation of 563.50 feet msl on November 1, 1981. For convenience the court will refer to the incident as the November 1, 1981, flood.

the lowest elevation, *i.e.*, 560.91 feet elevation, of said house an average of only once in 75 years, with a 1.35 percent chance of being equalled or exceeded in any one year. Based on the education, training and professional experience of the staff geologist, his affidavit is persuasive evidence. Said evidence stands uncontroverted.

Plaintiff, on March 30, 1982, filed a claim for damages with the Corps of Engineers on the ground the flood damage suffered by Lot 71 as a result of the November 1, 1981, flood was caused by the Corps of Engineers.[3] In her claim plaintiff proposed that her damage claim be resolved by the Corps' condemnation of Lot 71 for $130,-000[4] and the payment to plaintiff of chattel damages of $6,265,[5] and replacement and correction damages of $465.[6] The Corps of Engineers rejected plaintiff's claim by letter dated July 15, 1982. As indicated earlier, plaintiff sold Lot 71 on April 19, 1983, for $120,000.

In her complaint filed in this court, plaintiff seeks a damage award of $10,000, the difference between what plaintiff contends the fair market value of Lot 71 was before the November 1, 1981, flood and the $120,-000 sale price of Lot 71 in April 1983, chattel damages of $9,800, repair and replacement damages of $1,965 plus reasonable attorneys fees and costs.

## II.

### A. *Inverse Condemnation*

Plaintiff alleges that the November 1, 1981, flood which damaged her property constituted a taking of her property by inverse condemnation and entitles her to a just compensation award.[7] The undisputed material facts and the case law applicable thereto clearly show that there was no compensable taking of plaintiff's property as a result of the November 1, 1981, flood.

■ It is well established that the critical element of an inverse condemnation taking in a flooding case is that of inevitable recurring floods. *Bartz v. United States*, 224 Ct.Cl. 583, 593, 633 F.2d 571, 577 (1980). Government-induced flooding must be inevitable and recurring to constitute a compensable taking, otherwise it is merely consequential injury or a tort which, in such instances, recovery is not authorized in this court. *Barnes v. United States*, 210 Ct.Cl. 467, 474–475, 538 F.2d 865, 870 (1976).

■ It is undisputed that a single flood event, the November 1, 1981, flood, generated by substantial rainfall during late October and up to November 1, 1981, produced the damages for which claim is now made. It is settled that a single flood does not, *B Amusement Co. v. United States*,

---

**3.** Plaintiff charged the Corps of Engineers, *inter alia*, with: failing to purchase enough acreage to cover flooding and flowage when the Grapevine Project was first undertaken in 1948 and thereafter until 1962, failing to open Grapevine Dam to preclude flooding upstream, failing to warn property owners that area likely to flood, failing to take preventative measures, *e.g.*, sandbagging, and failing to develop surplus water pass-off areas.

**4.** In support of this proposition, plaintiff attached a letter from one real estate firm that advised Lot 71 had a market value of $120,000 as of January 27, 1982, and a second letter dated March 2, 1982, from another real estate firm, whose appraiser advised that while he was not well acquainted with property in that area, his best judgment was that Lot 71 had a market value of $140,000.

**5.** The items of this claim included a dining room table and 4 chairs, sheets, pillows, blankets, other bedding, water bed, clothes washer and dryer, refrigerator, clothing, stereo speakers, etc.

**6.** The items of this claim were termite spray, gravel on driveway, three bags of lime and personal effects.

**7.** As noted by the Supreme Court in *United States v. Clarke*, 445 U.S. 253, 255, 100 S.Ct. 1127, 1129, 63 L.Ed.2d 373 (1980): "There are important legal and practical differences between an inverse condemnation suit and a condemnation proceeding." The phrase "inverse condemnation" is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *Id.* at 257, 100 S.Ct. at 1130. *See also United States v. Dow*, 357 U.S. 17, 21, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109 (1958).

148 Ct.Cl. 337, 341–342, 180 F.Supp. 386, 389 (1960), nor indeed one, two or three floods by themselves do not, *National By-Products, Inc. v. United States*, 186 Ct.Cl. 546, 576, 405 F.2d 1256, 1273 (1969), constitute a taking by inverse condemnation. *See also Hartwig v. United States*, 202 Ct.Cl. 801, 809–810, 485 F.2d 615, 620 (1973). As was held in *North Counties Hydro-Electric Co. v. United States*, 138 Ct.Cl. 380, 382–383, 151 F.Supp. 322, 323, *cert. denied* 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112 (1957), "[t]wo floodings, one ten years after the pool behind the dam was completely full, and the other nineteen years after, do not constitute a taking. [Citations omitted.]"

■ As demonstrated in the uncontroverted affidavit by the Corps' Chief of the Hydrology and Hydraulics Branch of the Fort Worth District Office, submitted in support of defendant's motion for summary judgment, a flood of the magnitude of the November 1, 1981, flood would occur an average of about once in every 100 years. Further, this uncontroverted affidavit also establishes that an overflow from Grapevine Lake again reaching the lowest level of the residence on Lot 71, *i.e.*, 560.91 feet msl, would occur an average of about once in every 75-year period. Such undisputed facts clearly establish that a taking did not occur in this case. In *Fromme v. United States*, 188 Ct.Cl. 1112, 1119, 412 F.2d 1192, 1197 (1969), the United States Court of Claims, our predecessor court, held that a taking could not be found where the landowner could only show that flooding of his land "can reasonably be expected to recur at intervals of about once in every 15 years, on the average."

The undisputed material facts, and applicable case law show clearly that no taking of plaintiff's property by inverse condemnation occurred because of the November 1, 1981, flood.

■ However, plaintiff's claim bow has another string attached. Plaintiff alleges that her property was subject to a "multiple of trespasses and a multiple of infusions subsurface." Simply stated, plaintiff alleges a constant groundwater flooding of her property for a 2- or 3-year period prior to the November 1, 1981, flood. However, defendant demonstrated by uncontroverted affidavits, which were based on hydrological data recorded and compiled by the Corps, that there was no groundwater flooding of plaintiff's property during the 2- or 3-year period prior to November 1, 1981; that said groundwater flooding of Lot 71 only occurred when surface flooding occurred on Lot 71; and that the lowest elevation of the main residency on Lot 71 would be subject to groundwater or surface flooding an average of once every 75 years.[8] On these uncontroverted facts, it is clear plaintiff has not suffered a taking of her property, as the cases cited above demonstrate.

■ Plaintiff also suggests that the Corps in the initial stages of the Grapevine Dam Project delineated a "guide contour line" which authorized acquisition of properties within the guide contour lines which might be subject to flooding in various degrees. Part of Lot 71 was included within this guide contour line. However, no condemnation proceedings were undertaken relative to Lot 71. Plaintiff alleges that the delineation of part of Lot 71 within the guide contour lines constituted, under

---

8. Plaintiff alleges in her complaint that as a result of surface and groundwater or subsurface flooding, the foundation of her former residence was damaged structurally by the November 1, 1981, flood. Defendant offered affidavits by a structural engineer employed by the Corps of Engineers and a soils engineer employed by the Corps of Engineers, both of whom had personally examined the foundation in question in January 1984, who could find no structural damage to the foundation damage which could be attributed to either surface flooding or to rising groundwater. Such a finding, uncontroverted by plaintiff, is supported by the $120,000 and $140,000 valuations placed on the property by real estate firms in January and March 1982, which plaintiff submitted to the Corps of Engineers in support of her claim for damages. It is further supported by the fact that plaintiff sold Lot 71 in April 1983 for $120,000.

the circumstances of this case, a taking of Lot 71.[9] It should be noted that the Corps acquired lands for the Grapevine Dam Project during the period April 1948—April 1962. Plaintiff did not purchase Lot 71 until 1980.[10] Assuming, *arguendo*, that this delineation by the Corps of Lot 71 constituted the Corps' view that flooding would inevitably recur on Lot 71, such a finding would not aide plaintiff. The foreknowledge of the possibility of flooding by the Corps does not support a finding that a taking has occurred. Foreseeability of damage is not a factor in determining whether a taking has occurred, and it certainly does not remove the burden placed on plaintiff to establish that intermittent flooding will inevitably recur. As stated in *National By-Products, Inc. v. United States, supra,* "the Government's foreknowledge will not convert an otherwise insufficient injury into a taking. At most it could strengthen the plaintiff's case in a tort action." 186 Ct.Cl. at 579, 405 F.2d at 1275.

The above discussion demonstrates that plaintiff has not, and cannot, make out a taking claim by inverse condemnation as a result of the November 1, 1981, flood.

### B. *Tort*

■ In her complaint, plaintiff levels a series of charges against the Corps of Engineers relative to the Grapevine Dam Project. Plaintiff, in her amended complaint, seeks recovery on a tort theory, contending that, under the circumstances of this case,[11] this court, as successor to the United States Court of Claims, has jurisdiction under the Federal Tort Claims Act. Plaintiff is in error. This court, like its predecessor, has no original tort claim jurisdiction. *South Louisiana Grain Services v. United States,* 1 Cl.Ct. 281, 288 (1982).

■ The alleged wrongs, both of omission and commission, of the Corps of Engineers set forth by plaintiff in her complaint, as amended, clearly sound in tort.[12] As such, this court is without jurisdiction over the claims which are premised on said allegations, even if there were truth to them. For example, plaintiff's allegation that the Corps of Engineers' improper operation of the Grapevine Dam was responsible for the flooding damage she suffered clearly sounds in tort. *See Accardi v. United States,* 220 Ct.Cl. 347, 359, 599 F.2d 423, 430 (1979). *See also Hartwig v. Unit-*

9. It is settled that the mere authorization to acquire property for flood control or park projects does not obligate the government agency to initiate condemnation proceedings nor does it constitute an inverse condemnation. *See Danforth v. United States,* 308 U.S. 271, 286, 60 S.Ct. 231, 237, 84 L.Ed. 240 (1939); *Georgia-Pacific Corp. v. United States,* 226 Ct.Cl. 95, 118 n. 18, 640 F.2d 328, 344 n. 18 (1980). Indeed, even a threat to condemn property will not serve as a foundation for a taking claim. The mere delineation of Lot 71 in the "guide contour line" did not effect a taking by itself. *See Hilkovsky v. United States,* 205 Ct.Cl. 460, 464, 504 F.2d 1112, 1113 (1974).

10. A reasonable argument could be made that plaintiff has no taking claim based on land acquisitions by easement, or lack thereof, long before she purchased the property. The prior owners during the 1948–1962 period when land was acquired for the Grapevine Dam Project would seem to be the real party in interest in this regard. *See United States v. Dow, supra,* 357 U.S. at 21, 78 S.Ct. at 1044.

11. The critical circumstance in plaintiff's view is that the District Court for the Northern District

of Texas dismissed plaintiff's claim for damages arising out of the November 1, 1981, flood, on jurisdictional grounds, and advised that the United States Court of Claims had jurisdiction of plaintiff's claim.

12. Plaintiff charges the Corps of Engineers with: "(1) 'secreting' from plaintiff the danger of possible flooding of her real property from increased elevation of Grapevine Lake; (2) failure to warn her that her land might be flooded on or about October 31, 1981; (3) failure to place sandbags on or near plaintiff's property to protect it from flooding; (4) failure to operate the Grapevine Dam in accordance with 'basic plans of flood control;' (5) intentional trespasses and intentional wrongful taking of plaintiff's property rights; (6) misrepresentation about the possibility or damages of increased elevation of Grapevine Lake above a certain level; and (7) inadequate inclusion of plaintiff's land within those lands directly acquired in condemnation actions brought by the United States pursuant to the authorized flood control operation of Grapevine Dam. * * * "

ed States, supra, 202 Ct.Cl. at 806, 485 F.2d at 618. Further, defendant has submitted an affidavit from the Corps of Engineers' official responsible for the operation of the Grapevine Dam in accordance with the basic plans of flood control who states in some detail the essential and material facts relative to operation of the Dam during the critical period of late October—November 1, 1981. This affidavit uncontroverted, establishes that the operation of the Grapevine Dam at times material herein was reasonable, proper, and in accord with applicable flood control plans. Further, plaintiff's misrepresentation, wrongful inducement, or careless performance of duties allegedly owed claims, clearly are claims sounding in tort. *See Somali Development Bank v. United States,* 205 Ct.Cl. 741, 749, 508 F.2d 817, 821 (1974). So it is with all the charges that form the core of plaintiff's claim based on actions or inactions of Corps officials.

▮▮▮▮ Plaintiff's incorporation of a tort theory of recovery in her complaint recognizes the fact that her charges against the Corps of Engineers are tort oriented. She tries to overcome the jurisdictional tort hurdle by claiming that the government should be estopped from using this jurisdictional hurdle because the District Court has stated this court does have jurisdiction over the asserted claims. Regardless of what the District Court said in its dismissal order, it is settled that the District Court cannot confer jurisdiction on this court. This court can determine its own jurisdiction at any time. *See Peoples Apparel, Ltd. v. United States,* 226 Ct.Cl. 515, 517–518 (1980). The mere transfer of a case from the District Court to this court does not establish jurisdiction and the defendant is not estopped from arguing lack of our jurisdiction even if it may have

urged lack of jurisdiction in the District Court based on jurisdiction in this court. *Marshall N. Dana Constr., Inc. v. United States,* 229 Ct.Cl. 862, 865 (1982). Accordingly, as indicated above, plaintiff's allegations set forth in note 12, *supra,* support claims sounding in tort and are thus beyond the jurisdiction of this court. *Aetna Casualty and Surety Co. v. United States,* 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059 (1981).[13]

### C. *Implied Contract*

▮▮▮▮ In her complaint, as amended, plaintiff alleges that the Corps of Engineers, in acquiring land in connection with the Grapevine Dam Project "did in fact take less area than it should [have] in its initial condemnation proceedings and did delineate the outer area of [Grapevine] lake coverage such as to be an implied contract and implied agreement." Plaintiff further alleged in her complaint that "on occasion of the initial condemnation proceedings [the Corps of Engineers] elected to omit and not condemn [Lot 71]." Plaintiff pleads most inarticulately that defendant breached an implied agreement to condemn her property.

If plaintiff is asserting a contract implied-in-law, this court is without jurisdiction to hear it. *See Fincke v. United States,* 230 Ct.Cl. 233, 246–247, 675 F.2d 289, 296–97 (1982), and cases cited therein. *See also Wertz v. United States,* 2 Cl.Ct. 45, 52 (1983). If plaintiff is asserting a contract implied-in-fact, the amended complaint fails completely to state a claim upon which relief can be granted.

In order to show a contract implied-in-fact, plaintiff must allege, with reasonable specificity, an agreement based upon a meeting of the minds that can be inferred, as a fact, from the conduct of the parties

---

**13.** The damages suffered by plaintiff's chattels and the repairs necessary because of the November 1, 1981, flood are in the nature of a tortious invasion of plaintiff's rights, and do not rise to the magnitude of an appropriation of some interest in said property permanently to the use of the government. *National By-Products, Inc. v. United States,* 186 Ct.Cl. 546, 577, 405 F.2d 1256, 1273–1274 (1969). Moreover, repair and replacement damages are more properly viewed as consequential damages which are outside the pale of a Fifth Amendment taking recovery. *See T.O.F.C., Inc. v. United States,* 231 Ct.Cl. 182, 192–193, 683 F.2d 389, 395, 396 (1982).

which manifest their tacit understanding. *Prevado Village Partnership v. United States*, 3 Cl.Ct. 219, 224 (1983) and cases cited therein. A definitive offer by one party and an unconditional acceptance by the other must be established to show an implied-in-fact contract. *Id.* The complaint, no matter how liberally it is read nor how inferential one may try to be, fails to show any agreement between plaintiff and the Corps of Engineers regarding condemnation of Lot 71. In a case where the parties at least had contacts relative to the government building a levee on an owner's property for the owner's protection, the court refused to find any contractual obligation on the part of the government absent a definitive agreement between the parties. *See National By-Products, Inc. v. United States, supra,* 186 Ct.Cl. at 558–575, 405 F.2d at 1263–1272. Here, plaintiff does not allege any contacts, or dealings with the Corps of Engineers prior to the flood of November 1, 1981, regarding condemnation of Lot 71.

Plaintiff alleges that the Corps of Engineers in its initial condemnation proceedings, which took place between 1948 and 1962, delineated a portion of Lot 71 for condemnation but did not do so, thereby breaching an implied agreement to do so. The flaw in plaintiff's reasoning is that plaintiff did not purchase Lot 71 until December 1980, and any implied agreement of the type envisioned by plaintiff would have been made with the owners of Lot 71 land during the period 1948–1962, not plaintiff. *See United States v. Dow, supra,* 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109. *See also Aetna Casualty And Surety Co. v. United States, supra,* 228 Ct.Cl. at 151–154, 655 F.2d at 1052–1054; *Wertz v. United States, supra,* 2 Cl.Ct. at 52–53.

Plaintiff has failed to allege any facts which would indicate, suggest or support an inference that there exists the requisite elements of an implied-in-fact contract, *i.e.,*

a meeting of the minds and mutuality of intent that the Corps of Engineers would condemn plaintiff's property, Lot 71, at some time between December 31, 1980, when she purchased it and April 19, 1983, when she sold it.

There are no facts alleged which would justify any recovery for plaintiff on the theory of implied-in-fact contract.[14]

### III.

Plaintiff has opposed defendant's motion for summary judgment on the ground that there exists genuine issues of material fact. Plaintiff's opposition brief is convoluted and disjointed, and plaintiff's articulation of her position relative to material facts in dispute is less than helpful. Plaintiff does not attach, in support of her opposition to defendant's summary judgment motion any affidavits or evidentiary materials. Instead, plaintiff relies, for the most part, on counsel's argument and the cursory, generalized and conclusionary statements in the opposition brief, with brief references to the pleadings and documents attached thereto.

 The court starts with the proposition that just compensation cases are generally fact-intensive and this knowledge cautions against a precipitous grant of summary judgment in such cases. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983); *see also Skaw v. United States,* 740 F.2d 932 (Fed.Cir.1984). However, summary judgment plays a vital role in the judicial process and serves a useful purpose in appropriate just compensation cases. *Yuba Goldfields, Inc. v. United States, supra,* 723 F.2d at 887. The court believes this case is an appropriate one in which to grant summary judgment.

 If the moving party under RUSCC 56 shows by affidavits the absence

---

**14.** In truth, plaintiff's implied contract theory is most hazy as set forth in her complaint and opposition brief. However the matter is viewed, the uncontroverted facts before the court show that there was no substantial and burdensome government interference with plaintiff's use of her property from which a constitutional taking could be implied. *Cf. Benenson v. United States,* 212 Ct.Cl. 375, 388, 548 F.2d 939, 947 (1977).

of a genuine issue of fact, as defendant has done in this case, the burden then shifts to the other party, here the plaintiff, to avoid conceding the material facts set forth in these affidavits by coming forward with opposing affidavits in order to defeat the moving party's motion for summary judgment. The other party must do more than rely on any contrary allegations in her complaint or in her brief. It has been noted that it is perilous for the party opposing a motion for summary judgment not to proffer any countering evidentiary materials nor file counteraffidavits. *Adickes v. Kress & Co.*, 398 U.S. 144, 159–161, 90 S.Ct. 1598, 1609–1610, 26 L.Ed.2d 142 (1970). Yet, this is just what plaintiff did in this case.

 Defendant, by affidavits prepared by responsible officials, possessed of knowledge and experience in the fields of hydrology and geology and familiar with the area in question, established that the flooding of Lot 71, both surface and subsurface, while it was owned by plaintiff, was not and would not be inevitable and recurring. This material fact was not controverted by plaintiff by affidavit or other evidentiary material. A material fact is one which will make a difference in the result of the case. *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Having established this critical fact, in the context of the undisputed flood of November 1, 1981, case law, cited *supra*, mandates that as a matter of law defendant is entitled to a grant of summary judgment. All doubts, inferences and credibility have been resolved against defendant as the moving party in reaching this conclusion. *See Housing Corp. of America, v. United States*, 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972). Plaintiff's reliance on mere

formal denials or general allegations which do not show the facts in detail and with precision by affidavit or other countering evidentiary material are not sufficient to block the grant of summary judgment. *Royal Indemnity Co. v. United States*, 178 Ct.Cl. 46, 51, 371 F.2d 462, 465 (1967). In the absence of affidavits or countering evidentiary material, the court may, as it has in this case, accept as true the statements in defendant's affidavits. *Curtis v. United States, supra*, 144 Ct.Cl. at 199, 168 F.Supp. at 216.

 With respect to plaintiff's tort claim allegations, which plaintiff asserts, without any support by affidavit or other evidentiary matter,[15] raise genuine issues of material fact, it is sufficient to note that these allegations are not material since, as a matter of law, they are deemed by their tortious nature outside the jurisdiction of this court to consider. Summary judgment is thus appropriate to dispose of these claims. Since plaintiff complaint fails, on its face, to establish any basis, by inference or otherwise, for finding an implied agreement between plaintiff and the Corps of Engineers, and no affidavit or evidentiary material has been submitted by plaintiff relative thereto, summary judgment is also appropriate relative to the implied-in-fact claim.

 Plaintiff, recognizing the perilous position she was in relative to defendant's motion for summary judgment, requests, for the first time in her opposition brief, the court to deny defendant's motion and allow her to file affidavits not yet available and engage in discovery. It is too late in the day for such a request. To hold otherwise would mean that any party could defeat a motion for summary judgment by merely making a request for denial of said

---

**15.** These allegations reflect generalized, unspecific, and cursory assertions of wrongdoing by the Corps of Engineers which, on their face are insufficient to overcome the presumption that public officials properly perform their official duties and properly exercise their official responsibilities. *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 746, 572 F.2d 786, 805 (1978), and it

takes "well-nigh irrefragable proof" to overcome this presumption. *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954). The affidavits submitted by defendant corroborate this presumption in this case. The bulk of plaintiff's listing in her opposition brief of "genuine material disputed fact issues" are allegations of wrongdoing by the Corps of Engineers.

**168**

motion for allowance to file affidavits and conduct discovery. *See Curtis v. United States, supra,* 144 Ct.Cl. at 199, 168 F.Supp. at 216. The complaint was filed in this case on January 14, 1983. Defendant's motion to dismiss, filed on March 15, 1983, caused plaintiff to amend her complaint. Defendant moved for summary judgment on February 24, 1984. After receiving an extension of time, plaintiff filed her opposition to defendant's motion for summary judgment on May 31, 1984. Thus, plaintiff had ample time to obtain affidavits in support of her opposition to defendant's motion. Further, plaintiff had available to her the Rules of this court if she needed additional time to obtain said affidavits before and after filing her opposition brief. *See e.g.,* RUSCC 56f. See in this regard *Security & Exch. Comm'n. v. Spence & Green Chem. Co.,* 612 F.2d 896, 901 (5th Cir.1980), *cert. denied,* 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981). Plaintiff, represented by counsel, has been given a fair opportunity to litigate this matter. She is not entitled to more on the basis of her opposition brief. Summary judgment should not be denied on the mere assertions of counsel or conclusionary pleading that genuine issues of fact exist, which is the case here, nor should such a motion be denied merely to satisfy a litigant's speculative hope of finding some evidence that might serve to save her complaint from dismissal. *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624 at 626, 627 (Fed.Cir.1984).

### IV.

■ While this court does not have jurisdiction over tort claims, the District Court does. The question arises as to whether this case should be transferred to the District Court for ventilation of possible tort claims under 28 U.S.C. § 1631, as amended by Pub.L. No. 97–164, 96 Stat. 55, effective October 1, 1982. Such a transfer should occur only if it would be in the public interest, and should not take place if the action most probably would be dismissed in the District Court. The court should not countenance the performance of a futile act if it only produces a drain on party and judicial economy and time.

Assuming plaintiff's tort claims to have some viability, given the nature of the claims, flood damage, and the nature of the charges, negligence and misrepresentation by the Corps of Engineers relative to performance, or nonperformance, of flood control project activities,[16] it seems clear that plaintiff would, on transfer to the District Court, be faced with the provisions of 33 U.S.C. § 702c (1976). Section 702c provides that "no liability of any kind shall attach to or rest upon the United States from any damage from or by floods or flood waters at any place."

■ Accepting plaintiff's allegations of wrongdoing in her amended complaint, as true, it seems clear that such claims are within the pale of section 702c and any District Court action thereon would most probably reject said claims. *See Baird v. United States,* 5 Cl.Ct. 324, pp. 332–333 (1984) (Colaianni, J.); *Pierce v. United States,* 650 F.2d 202, 203–205 (9th Cir. 1981); *Burlison v. United States,* 627 F.2d 119, 120–122 (8th Cir.1980). *See also B Amusement Co. v. United States,* 148 Ct.Cl. 337, 342–343, 180 F.Supp. 386, 389–390 (1960).

---

**16.** For example, plaintiff in her opposition brief stresses her argument that the Corps of Engineers improperly failed to release impounded water from the Dam during the November 1, 1981, flood in order to protect properties downstream, particularly a community golf course. Had the impounded waters been released, plaintiff alleges, her property would not have been flooded. Again, plaintiff alleges the Corps of Engineers improperly failed to warn plaintiff and others of the probable consequences of flooding and failed to notify plaintiff that part of Lot 71 was within the guide contour line, referred to by plaintiff as "secret maps", established by the Corps of Engineers when land was being acquired, in fee and by easement, in the 1948—1962 period of the Grapevine Dam Project. The guide contour line indicated that flooding in varying degrees might occur within the confines of the established line. Further, plaintiff faults the Corps of Engineers for not sandbagging plaintiff's property during the November 1, 1981, flood.

Since it would not further the interests of justice, the court declines to order the transfer of this case to the District Court for the Northern District of Texas, Fort Worth Division. *See Moss v. United States*, 229 Ct.Cl. 837, 841 (1982); *Thompson Tower Limited Dividend Housing Association v. United States*, 228 Ct.Cl. 766, 771 (1981).

## V.

For reasons discussed above, defendant's motion for summary judgment is granted, with plaintiff's complaint, as amended, to be dismissed.