## J.R. COOPER

v.

## The UNITED STATES.

### No. 681–84L.

United States Claims Court.

Jan. 16, 1987.

Jim Waide, Tupelo, Miss., for plaintiff.

Alan Brenner, with whom was Asst. Atty. Gen. F. Henry Habicht II, Washington, D.C., for defendant.

## OPINION

WHITE, Senior Judge.

The complaint in this case alleges in the first paragraph that the purpose of the action is "to recover damages because the defendant, United States of America, has destroyed private property for public use without paying just compensation in violation of the United States Constitution Amendment Five."

It is explained later in the complaint that the private property allegedly destroyed consisted of timber located on a 467–acre farm in Itawamba County, Mississippi, the legal description of which is all that portion of Section 11, Township 8 North, Range 8 East, which lies west of the east fork of the Tombigbee River. (This farm will usually be referred to hereafter in the opinion as "the Cooper farm.")

action. That interest would appear to remain    assertible.

The plaintiff, J.R. Cooper, is the present owner of the Cooper farm.

A motion by the defendant, asking the court to dismiss the complaint for lack of jurisdiction, was denied by the court in an order dated May 28, 1985. *Cooper v. United States*, 8 Cl.Ct. 253 (1985).

The case was subsequently tried on the merits, and the parties submitted post-trial briefs. Counsel for the plaintiff requested an opportunity to present oral argument, but this request was not granted in view of the history of the case and remarks made by the trial judge on the record at the conclusion of the trial.

### The Facts

The facts, as found by the trial judge on the basis of the evidence adduced at the trial, will be set out in this part of the opinion.

### Nature of the Cooper Farm

The east fork of the Tombigbee River forms the eastern boundary of the Cooper farm; and some 250 acres of the Cooper farm are in the nature of bottom land that lies within the flood plain of the east fork of the Tombigbee. Approximately 200 acres of the bottom land are in timber, and the remainder of the bottom land was formerly used for the production of hay. The upland area on the Cooper farm, consisting of approximately 200 acres, was formerly used for the production of row crops, such as cotton, soybeans, and corn, cotton being the principal money crop. In addition to hay being grown on a portion of the bottom land and row crops being grown on the upland, cattle were also raised on the Cooper farm in former years.

Brown Creek, Little Brown Creek, and Mackeys Creek are streams that run into the east fork of the Tombigbee River north of the Cooper farm. These streams, including the east fork of the Tombigbee, run in a generally north-to-south direction.

Historically, it has been common for the east fork of the Tombigbee River to overflow its banks north of the Cooper farm during the winter months, and for the flood waters to invade and cover substantial portions, or even all, of the bottom land on the Cooper farm. Occasionally, in times of unusually heavy rains upstream during the winter months, the flooding of the bottom land has been so extensive that the flood waters would stand on the bottom land for substantial periods of time before it could drain back into the east fork of the Tombigbee River.

Moreover, in the historic past, the east fork of the Tombigbee River has sometimes overflowed its banks north of the Cooper farm during the spring and summer months, with the result that the bottom land on the Cooper farm has been invaded by flood waters. Before 1979, however, there was always a quick runoff of the flood waters in the spring and summer.

Before 1979, there was no significant damage to the timber on the Cooper farm from flooding by the east fork of the Tombigbee River, either during the winter months or during the spring and summer.

### Ownership of the Cooper Farm

The plaintiff, J.R. Cooper, first became associated with the Cooper farm in 1948. At that time, the Cooper farm was owned by the plaintiff's uncle, S.K. Cooper.

In 1948, the plaintiff, who had been studying Civil Engineering at Mississippi State University, left the university and joined his uncle, S.K. Cooper, for the purpose of assisting his uncle in the operation of the Cooper farm, and in the raising of cattle and the production of row crops and hay on the farm. This relationship between the plaintiff and his uncle continued until March of 1951, when the plaintiff secured an appointment as a rural letter carrier out of Mooreville, Mississippi, for the U.S. Post-Office Department, later the U.S. Postal Service. The plaintiff continued to serve as a rural letter carrier until his retirement from the service on June 1, 1984. Even after becoming a rural letter carrier, however, the plaintiff continued to work with his uncle on the Cooper farm during the plaintiff's spare time, until 1960. After completing his daily round as a rural letter carrier, the plaintiff would go to the

farm and work there for the remainder of the day.

As of 1960, the plaintiff was married, and two children had been born to the marriage. The plaintiff's wife was displeased over the amount of time that the plaintiff was spending at the Cooper farm.

Sometime in 1960, the plaintiff went to his uncle, S.K. Cooper, and told the latter that, at the end of 1960, he (the plaintiff) was going to leave the farm in order to devote his time to other things. Some 2 or 3 weeks later, S.K. Cooper came to the plaintiff one day, while the plaintiff was working at the farm, and told the plaintiff that he (S.K. Cooper) did not want the plaintiff to leave the farm; that he and his wife did not have any children; and that his wife was not particularly interested in the farm. Testifying further at the trial about the 1960 conversation which S.K. Cooper had with him, the plaintiff quoted his uncle as saying, "if I would stay with him, he would give me that place * * * [h]e would be sure that I got that place at his death."

Some 2 weeks after the 1960 conversation previously referred to between S.K. Cooper and the plaintiff, S.K. Cooper told the plaintiff that "the necessary papers" had been drawn up. There is no evidence in the record concerning the nature of the papers mentioned by S.K. Cooper; and there is no evidence in the record that any sort of title instrument relating to the Cooper farm was executed by S.K. Cooper earlier than October 1982.

In reliance on S.K. Cooper's promise, the plaintiff stayed with S.K. Cooper and continued to work on the Cooper farm during his spare time as a rural letter carrier during the remainder of 1960 and thereafter until the latter part of December 1982, because the plaintiff was confident that he was going to have the Cooper farm "in the future." The plaintiff did not receive any compensation for the work that he did on the Cooper farm, although he was reimbursed for his expenses incurred in going to and from the farm.

On October 5, 1982, S.K. Cooper executed a warranty deed to the Cooper farm in favor of the plaintiff, but S.K. Cooper retained a life estate in the property.

A few months later, on December 25, 1982, S.K. Cooper died.

### Construction of Tennessee-Tombigbee Waterway

At times material to this case, the United States (acting through the Army Corps of Engineers) was engaged in the construction of the Tennessee-Tombigbee Waterway (frequently referred to as the "Tenn-Tom"), which was designed to connect the Tennessee River on the north with the Gulf of Mexico on the south and provide transportation by water for cargo-carrying barges and other types of marine traffic. The east fork of the Tombigbee River in the vicinity of the Cooper farm was not utilized as part of the Tenn-Tom, but a portion of Mackeys Creek, in the Bay Springs area some 12 miles to the north of the Cooper farm, was utilized as part of the Tenn-Tom. The work on Mackeys Creek involved extensive land-clearing operations and much heavy construction work.

As stated earlier in the findings of fact, Mackeys Creek empties into the east fork of the Tombigbee River at a point north of the Cooper farm. In time, debris from the work on the Mackeys Creek portion of the Tenn-Tom began to flow southward down Mackeys Creek and into the east fork of the Tombigbee. By 1979, such debris, including treetops, saw logs, brush, stumps, and bridge timbers, had blocked the east fork of the Tombigbee River adjacent to the Cooper farm for a distance of from 1 to 1½ miles.

In September and October of 1980, the Corps of Engineers tried to remove the debris from east fork of the Tombigbee River, but the efforts were not successful at that time. The blockage remained in the river during the 1979–83 period and into 1984, but the river was ultimately cleared by the Corps of Engineers sometime in 1984.

As a result of the blockage of the east fork of the Tombigbee River adjacent to

the Cooper farm, the bottom land on the Cooper farm was not only subjected to a much greater volume of flood water during the 1979–84 period than had been true during the years before 1979, but the blockage also impeded the drainage of flood water back into the east fork of the Tombigbee, so that flood water stood on the bottom land for much longer periods of time, both in the winter and in the growing season for timber, than had been the case before 1979. At all times during the period of the river blockage, at least some part of the bottom land had flood water standing on it. In the summer of 1980, for example, approximately 150 acres of the bottom land were covered by flood water for a long period of time.

Sometime in 1984, the Army Corps of Engineers finally removed the blockage from the east fork of the Tombigbee River. Since that time, the Cooper farm has not been subjected to any unusual flooding.

The evidence in the record shows that flood water standing on timber land for substantial periods of time during the winter months in the Mississippi area that is involved here does not adversely affect the timber, so long as the flood water recedes from the land before the trees emerge from their state of winter dormancy. Even flood water standing on timber land for a maximum period of 2 or 3 days during the spring and summer growing season will not adversely affect the timber. On the other hand, flood water standing on timber land for substantial periods of time during the growing season will adversely affect the timber and cause it to be stressed, as the standing water cuts off the supply of air to the roots of the trees.

As indicated earlier in the findings of fact, the timbered area of the bottom land on the Cooper farm was subjected to standing flood water from the east fork of the Tombigbee River for long periods of time during the spring and summer growing seasons of the 1979–84 period. As a result, the timber in the bottom land became stressed, and some trees began to die, as early as 1979. As of the end of 1979, the number of dead trees, scattered through-

out the approximately 200 acres of timber land on the Cooper farm, covered the equivalent of approximately two acres of dead trees. By August 20, 1980, approximately 10 percent of the trees in the timbered area were dead, and more than 50 percent of the trees in the area were damaged. By September 2, 1984, the dead timber represented the equivalent of approximately 75 acres of dead trees.

If the clogged condition of the east fork of the Tombigbee River that existed during the 1979–84 period had continued after 1984, further damage to and destruction of timber in the bottom land of the Cooper farm would have continued after 1984. As noted previously, however, the Army Corps of Engineers removed the obstructions from the east fork of the Tombigbee River in the vicinity of the Cooper farm sometime during the year 1984, and the bottom land has not been subjected to unusual flooding since then.

*Discussion*

The complaint in this case and the evidence adduced by the plaintiff at the trial make it plain that the plaintiff is suing under the "taking" clause of the Fifth Amendment to the Constitution for the destruction of timber on the Cooper farm. The "taking" clause states, "nor shall private property be taken [by the United States] for public use, without just compensation."

As will be seen from a perusal of the findings of fact, no timber, dead or otherwise, on the Cooper farm was actually taken by the United States for public use. All the timber that was on the Cooper farm when the United States began its construction activities on the Tenn-Tom in that part of Mississippi was still standing on the farm when the United States completed the Tenn-Tom operations, so far as this record shows.

On the other hand, the evidence does show clearly that the United States, by its actions in connection with the construction of the Tenn-Tom on Mackeys Creek, did take by inverse condemnation a temporary

flowage easement over the bottom land on the Cooper farm during the 1979–84 period, with the result that much growing timber in the flooded portion of the farm was killed. The destruction of the growing timber would constitute a proper element of the just compensation for which the United States became liable because of the taking of the temporary flowage easement. *Barnes v. United States*, 210 Ct.Cl. 467, 479, 482, 538 F.2d 865, 872, 874 (1976).

It becomes necessary, therefore, to determine when the taking of the temporary flowage easement occurred. This is a determination "in the nature of a jury verdict" (*Barnes v. United States*, 210 Ct.Cl. at 480, 538 F.2d at 873), which is to be based on the particular facts of the case (*Berenholz v. United States*, 1 Cl.Ct. 620, 626 (1982), *aff'd*, 723 F.2d 68 (Fed.Cir. 1983)).

On the basis of the facts in this case, the court concludes that the temporary flowage easement over the bottom land on the Cooper farm was taken by the United States in 1979. By that year, the blockage in the east fork of the Tombigbee River near the Cooper farm, as a result of the defendant's construction activities on the Tenn-Tom to the north of the farm, was such that an unusually large volume of flood water from the clogged river was invading the bottom land on the Cooper farm and then standing on the bottom land for unusually long periods of time, both in the winter and during the spring and summer growing season. It was obvious as of 1979 that this condition would inevitably recur each year, so long as the river continued to be clogged. *See Barnes v. United States*, 210 Ct.Cl. at 474–75, 538 F.2d at 870; *Hartwig v. United States*, 202 Ct.Cl. 801, 809–10, 485 F.2d 615, 619–20 (1973); *Singleton v. United States*, 6 Cl.Ct. 156, 162 (1984); *Amick v. United States*, 5 Cl.Ct. 426, 429–30 (1984).

The big problem for the plaintiff in prosecuting this case is that he did not own the Cooper farm in 1979. At that time—and, indeed, until late 1982—the Cooper farm was owned by the plaintiff's uncle, S.K. Cooper.

■ It is beyond cavil that a plaintiff must be the owner of the property in question at the time of its taking in order to assert a valid claim under the "taking" clause of the Fifth Amendment. As the Supreme Court explained in *United States v. Dow*, 357 U.S. 17, 20–21, 78 S.Ct. 1039, 1043–44, 2 L.Ed.2d 1109 (1958), "it is undisputed that '[since] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment'" (quoting *Danforth v. United States*, 308 U.S. 271, 284, 60 S.Ct. 231, 236, 84 L.Ed. 2 (1939)).

Our predecessor, the United States Court of Claims, recognized this proposition as well. For example, in *Lacey v. United States*, 219 Ct.Cl. 551, 560, 595 F.2d 614, 619 (1979), the Court of Claims stated that "[t]he person entitled to compensation for a taking of property by the Government is the owner of the property at the time of the taking."

The Claims Court has also upheld this principle. In *Murray v. United States*, 10 Cl.Ct. 696, 698 (1986), this court said that "it is well established by court decisions that if and when the Federal Government takes private property for public use, it is the *owner*—and only the owner—of such property at the time of the taking that is entitled to receive the required compensation." (Emphasis in original.) Indeed, in ruling earlier on the defendant's motion to dismiss in this very same case, the court stated that "[i]n an action under the Fifth Amendment based upon the alleged taking by the United States, through inverse condemnation, of property without just compensation, it is clear that only the owner of the property at the time of the taking is entitled to be compensated for the taking" (*Cooper v. United States*, 8 Cl.Ct. at 254–55).

■ Therefore, as J.R. Cooper, the plaintiff, was not the owner of the Cooper farm in 1979, when the United States, through inverse condemnation, took a temporary

flowage easement over the bottom land on the Cooper farm, all the known legal authorities are in agreement that the plaintiff does not have standing to sue for such taking under the Fifth Amendment to the Constitution.

■ The plaintiff's post-trial brief asserts that state law should govern questions of title to land, and asserts that, "[b]ased upon the doctrine 'equitable estoppel', Mississippi law recognizes the 1960 oral agreement transferring the property to J.R. Cooper."

Actually, it is plain from the findings of fact that there was no "1960 oral agreement transferring the property to J.R. Cooper." What S.K. Cooper said to the plaintiff in 1960 was that if the plaintiff would stay with him, he would make sure that the plaintiff received the Cooper farm *at his death.*

The plaintiff, who impressed the court as a very straightforward, honest witness, testified that, in reliance on his uncle's promise, he continued after 1960 to work on the Cooper farm because he knew he was going to get the farm *in the future,* not because he understood that the farm was orally transferred to him in 1960.

S.K. Cooper made it plain, at the time of his 1960 conversation with the plaintiff, that he intended to retain the ownership of the Cooper farm until his death. This intention was confirmed on October 5, 1982, when S.K. Cooper, in executing a warranty deed in favor of the plaintiff, retained a life estate in the property.

Accordingly, the plaintiff did not become the owner of the Cooper farm until December 25, 1982, when S.K. Cooper died and his life estate in the property was extinguished. That was some 3 years after the United States had taken the temporary flowage easement over the bottom land on the Cooper farm.

## CONCLUSION OF LAW

Based upon the facts as found by the court, the court concludes as a matter of law that the plaintiff is not entitled to recover.

The clerk will therefore dismiss the complaint.

No costs.

IT IS SO ORDERED.